**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DANA WATSON, and all others similarly-situated, | Civil Action |
| Plaintiffs, | No. |
| v. | |
| LINKED HAIR SALON, LLC, and DEONNA FLETCHER aka DEE MICHELLE, | JURY TRIAL DEMANDED |
| Defendants. | |

<u>**CIVIL COMPLAINT**</u>

Plaintiff, Dana Watson, by undersigned counsel, files this Civil Complaint, and in support states the following.

**I. Jurisdiction**

1. Plaintiff invokes the Court's federal question jurisdiction pursuant to 28 U.S.C. § 1331 and the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

**II. Parties**

2. Plaintiff, Dana Watson ("Ms. Watson"), is an adult individual who resides in Allegheny County, Pennsylvania.

3. Defendant, Linked Hair Salon, LLC ("Linked") is a Pennsylvania limited liability company with a principal place of business located at 223 North Avenue, Millvale, PA 15209.

4. Defendant, Deonna Fletcher aka Dee Michelle ("Ms. Michelle"), is an adult individual who resides in Allegheny County, Pennsylvania.

5. Ms. Michelle is the owner of Linked.

6. Ms. Michelle has the authority to make wage payment decisions for Linked.

7. At all times relevant, Linked was an employer engaged in commerce.

8.    At all times relevant, Linked had an annual gross volume of sales made or business done of more than $500,000.

### III. Factual Background

**A. Linked Hires Ms. Watson as a Salon Assistant on an Hourly Basis.**

9.    On or around August 4, 2024, Ms. Watson signed an Employment Agreement ("Agreement") for the position of Salon Assistant with Linked Hair Salon.

10.    On or around July 27, 2024, Ms. Watson began working at Linked as a Salon Assistant.

11.    Linked is a boutique hair salon that provides luxury hair installations to its clients for $3,600 to $7,000 per installation.

12.    Upon information and belief, Linked performs two to three installations per day, six days per week.

13.    Ms. Watson's duties included scheduling appointments, answering phone calls, writing emails, sweeping the floor, performing very basic hair services like washing and blow drying, and responding to social media inquiries.

14.    At the time of hire, Ms. Watson had no independent skills with specialized hair installations.

**B. Linked Misclassifies Ms. Watson as an Independent Contractor.**

15.    At all times Ms. Watson worked as a salon assistant for Linked, she was classified as an independent contractor and Linked did not withhold taxes from her pay.

16.    At the start of Ms. Watson's employment, Ms. Michelle asked Ms. Watson if she preferred to be on a 1099 or W-2 basis.

17.    When Ms. Watson responded that she would prefer to be a W-2 employee, Ms.

Michelle said that it would cost Linked more money and wouldn't be good for Ms. Watson. Ms. Michelle said she didn't have any benefits to offer Ms. Watson and that she would instead pay her on a 1099. Ms. Michelle alleged that 1099 was better for Ms. Watson because then she could get "perks" and claim as a tax write off anything she purchased for the business.

18.     The Agreement reflects an employment relationship because it labels the parties "Employer" and "Employee," it dictates Ms. Watson's work responsibilities and work hours, imposes a dress code and performance expectations, and reflects an at-will, continuous relationship.

19.     Indeed, the reality of the relationship between Linked and Ms. Watson was that of an employer and employee, not a contractor and contractee.

20.     For example:

    a.  Ms. Watson and Linked's relationship was continuous with no fixed end date;

    b.  Linked set Ms. Watson's work schedule, dictated whether or when she could take breaks, and dictated what work she was to perform;

    c.  Ms. Watson had no control over how much Linked charged its customers;

    d.  Ms. Watson's role as salon assistant is central to Linked's principal business;

    e.  Ms. Watson worked in Linked's salon space;

    f.  Ms. Watson's main duties did not require any independent, specialized knowledge;

    g.  Linked required Ms. Watson follow a dress code; and

    h.  Linked provided her training in how to perform her job and to assist in hair installations.

21.     Ms. Watson received from Linked a form 1099-NEC for 2024.

**C. Linked Fails to Pay Ms. Watson and other Salon Assistants Overtime.**

22.  Linked paid Ms. Watson an hourly rate of $20 from approximately July 27, 2024 to September 28, 2024.

23.  Linked required Ms. Watson to work Monday – Saturday, 8:00am – 6:00pm.

24.  Linked required Ms. Watson to work additional hours by staying late at the salon to assist in a service or to complete administrative tasks from her home.

25.  As such, Ms. Watson was regularly working at least 58-80 hours per work.

26.  For example, during the week of September 1, 2024 through September 7, 2024, Ms. Watson worked 71 hours and 38 minutes.

27.  Ms. Watson continued to work the same schedule after Linked switched her pay to a salary basis on or around September 30, 2024.

28.  Ms. Watson traveled to Atlanta, Georgia and Paris, France in October and November 2024, respectively, for Linked business purposes.

29.  While on these trips, Ms. Watson regularly worked 13-20 hour days.

30.  Ms. Watson's primary job duties did not involve the supervision of more than one worker at a time; non-manual office work; an advanced degree in a field of science or learning; or outside sales.

31.  At no time did Linked ever pay Ms. Watson any overtime compensation for hours worked over 40 hours per workweek.

32.  During the course of Ms. Watson's employment, Linked employed two other salon assistants, David and Ameena.

33.  Upon information and belief, David was employed from around September 18, 2024 to October 12, 2024.

34.     Upon information and belief, Ameena began working at Linked on or around November 24, 2024 and is currently still employed.

35.     David and Amena were paid hourly, on a 1099 basis, and were required to work over 40 hours every workweek.

36.     At no time has Linked paid any of its salon assistants overtime compensation for hours worked over 40 hours per workweek.

**D. Ms. Watson Complains about Working Hourly without Overtime Pay.**

37.     On or around September 13, 2024, Ms. Watson texted Ms. Michelle to discuss her employment, and to specifically discuss earning overtime wages.

38.     Ms. Watson expressed she would be going into work the next day after already working 64 hours that week and wondered why she was not eligible to be paid overtime.

39.     Ms. Michelle responded that "getting paid on 1099, overtime pay doesn't apply to you. If you want overtime pay you would need to switch to a W-2 employee, but there would be more guidelines/regulations that I would have to adjust for that was well."

40.     Ms. Michelle and Ms. Watson held a similar discussion by phone on or around September 15, 2024.

41.     In this conversation, Ms. Watson again complained that she was not paid overtime wages. Ms. Michelle responded "that's just how it is in this business. No one gets overtime. That's not how this works."

42.     Ms. Michelle also said that it would cost her more money to have W-2 employees and that while she "does not have a problem" giving more money to Ms. Watson, she would prefer not to "give more money to government."

43.     Ms. Michelle added that if she were to switch Ms. Watson to a W-2 employee, she

would not give her a raise; would not guarantee her any hours; and would hire someone else willing to work on a 1099 basis.

44.     When Ms. Watson reiterated that she was working Saturdays without overtime pay, Ms. Michelle responded that Ms. Watson must commit to being flexible.

45.     Ms. Michelle refused to switch Ms. Watson to a W-2 employee, and to pay her overtime, at any time during her employment.

### E. Linked Changes Ms. Watson to Salary Basis and Introduces the Stylist in Training Program.

46.     On or around September 26, 2024, Ms. Michelle presented Ms. Watson with a new compensation package including a salary of $2,750 biweekly, or $71,500 annually, that would begin September 30, 2024, and included guaranteed commission opportunities in conjunction with a new training program.

47.     Ms. Michelle told Ms. Watson she would begin a Stylist-in-Training program ("SIT Program") on October 16, 2024 so that she could gain experience as a stylist and build her own clients while earning additional compensation.

48.     As part of this program, Ms. Watson was guaranteed one fully independent client installation each week. Ms. Michelle agreed that she would find these clients by making a post on her Instagram page each week offering discounted services for clients booking with Ms. Watson.

49.     Customers booking with Ms. Watson during the length of the program were to pay Linked a minimum of $1,500 per service. The profits would be split 50/50 between Linked and Ms. Watson.

50.     Ms. Watson accepted the above terms and continued to work for Linked in reliance on those terms.

51.     It was also agreed during this meeting that Ms. Watson would earn a flat

commission of $150 for each installation she assisted.

52.    Linked failed to post on its social media sites advertising Ms. Watson's services and failed to find Ms. Watson her own clients during the first nine weeks of the program.

53.    Therefore, Linked failed to fulfill its duties under the agreed-upon terms set forth above.

54.    As such, Ms. Watson did not receive any paying clients of her own during that time, losing up to $750 per week in commission for nine weeks, or $6,750.

55.    On at least one occasion, Linked reached out to a client that booked with Ms. Watson, and reassigned the client to Ms. Michelle.

56.    On December 3, 2024, Ms. Michelle presented Ms. Watson with a SIT Program document; however, the terms were materially different from what was discussed on September 26, 2024.

57.    For example, Linked no longer had a duty to find clients for Ms. Watson during the duration of the SIT program and Ms. Watson would only earn $50 per hour, up to $150 total, in commission to assist in installations.

58.    On December 9, 2024, Ms. Watson emailed Ms. Michelle questions and concerns about her position and the SIT program, writing, "Having anticipated a minimum of $750 additional income after a 50/50split from the least expensive installation ($1500) once a week, I have now lost the opportunity to earn a minimum of $6,750 after now 9 weeks of never having a paying client since the program began."

59.    In an email response, Ms. Michelle acknowledged the changes to the Program when she wrote, "I understand your concerns regarding the SIT program and the discrepancies between what was initially discussed and the updated documentation."

60.    Ms. Michelle later formally paused the implementation of the SIT Program.

**F. Ms. Watson Further Complains about Not Being Paid Overtime.**

61.    Also in the December 9 correspondence, Ms. Watson wrote, "With that being said, I would just humbly ask that because I am the only employee that currently works 8am-5:30pm which is already beyond an 8hr shift. In a 5day, work week I would be working 47.5 hours plus typically working an extra 9.5hr shift on Saturdays, any allowances that can be given for an extra hour or half hour to come in are greatly appreciated."

62.    On December 19, 2024, Ms. Michelle and Ms. Watson discussed Ms. Watson's questions and concerns regarding her pay and the future of the SIT Program.

63.    During that meeting Ms. Watson complained that she had been working overtime every week, and every Saturday, despite her salary being for a 40 hour, 5-day work week. She complained that when she worked more than 40 hours, her hourly pay per hour decreases since she was being paid a flat rate salary.

64.    Later in the conversation, Ms. Michelle admitted it was her own fault that the SIT Program had not been implemented, and that she had not been organized enough to fulfill the promises she made to Ms. Watson, which include providing weekly clients that would pay Ms. Watson for her installation services.

65.    On December 26, 2024, Ms. Watson emailed Ms. Michelle a summary of the discussion that took place on December 19, and reiterated the fact that she was not being paid overtime: "I communicated . . . That I will not be available 6days/week working 9.5+hours/day and pointed out that my 5day work week already extends well beyond a 40hr work week. And when I work an additional 9.5hours on Saturday, I do not receive any additional compensation which, when done every single week, decreases my earning significantly (along with the other

decreases I am experiencing).”

66.     In the early morning of December 28, 2024, Ms. Michelle and Ms. Watson exchanged emails in response to Ms. Watson's December 26 email.

a. At 1:18 AM, Ms. Michelle wrote: “What's particularly concerning is how you've taken it upon yourself to not only track current revenue but to project and calculate what you believe you should be earning.” Ms. Michelle demanded that by 8:00pm on December 30, 2024, Ms. Watson either quit or “stay and realign with your role” which required Ms. Watson cease all documentation and monitoring of business operations, and to trust Ms. Michelle's leadership “respecting the boundaries of confidentiality and business ownership.”

b. At 3:48 AM, Ms. Michelle wrote: “From the very beginning, I clearly communicated that your pay would be $20 per hour. Despite this, you questioned your pay after a few payrolls as if I had not been transparent. To accommodate your needs, I increased your pay beyond what was originally agreed upon—something I did out of consideration and did not have to do. This adjustment was meant to show flexibility and support, yet your response has reflected an unwarranted lack of trust in my communication. The implication that there was ambiguity in what I promised or delivered is inaccurate. Especially considering that I have gone above and beyond to ensure your compensation exceeds standard expectations.”

c. At 10:37 AM, Ms. Watson wrote: “One thing I truly am not understanding is how or why my ability to recall what my boss says is a troubling practice, especially in regards to financial compensation. I left my prior employment for

this job opportunity. I took a pay cut which, yes I was well aware that I was going to be making $20/hr. I was not aware that I would not be being paid overtime. I never questioned $20/hr. I questioned why I was not receiving overtime. I never asked for a higher hourly pay nor did I ask for salary. I asked for fair compensation if overtime hours were not honored. . . . [I]n regards to compensation, I believe I reserve the right to question when terms of compensation change. My questioning is not challenging."

d. At 11:41 AM, Ms. Michelle wrote: "Your comments about questioning overtime or flat rates may have been intended as a way to gain clarity, but they came across as challenging the terms we had already established. . . . This is not a partnership or a co-management relationship; this is my business, and the decisions I make are based on what is best for its success. Your role is to support those decisions, not to question or validate them."

e. On December 30, 2024 at 7:55 PM, Ms. Watson informed Ms. Michelle that she chose to continue in her role at Linked.

67. On December 31, 2024, at 12:16 AM, Ms. Michelle placed Ms. Watson on unpaid, administrative leave.

**G. Linked Terminates Ms. Watson and Withholds Paying Ms. Watson's Final Paycheck.**

68. On January 10, 2024, Ms. Michelle emailed Ms. Watson a formal termination notice and a letter titled "Post-Termination of Contract."

69. The Post-Termination Contract purported to require Ms. Watson to return all salon property, remove all salon content from her social media, reaffirm a confidentiality agreement, and restrict her "use, reference, or affilia[tion]" with the Dee Michelle and Linked brands.

70.    Ms. Michelle made Ms. Watson's signing of the Post-Termination Contract a condition of receiving her final paycheck for the pay period of December 29, 2024 – January 4, 2025.

71.    Ms. Watson did not sign the Post-Termination Contract.

72.    Ms. Watson worked one day during that pay period, December 30, 2024.

73.    To date, Linked has not paid Ms. Watson for work completed on December 30, 2024.

### H.  Collective Action Group Allegations

74.    Plaintiffs bring this FLSA lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of the following group of potential opt-in litigants:

> All individuals who worked as Salon Assistants for Linked between January 29, 2022 and the present, and who did not receive overtime compensation of time and one half for any hours worked over 40 hours in any workweek from January 29, 2022 to present.

75.    Plaintiffs and the above collective action group members are "similarly situated" as that term is defined by 29 U.S.C. § 216(b), because, *inter alia*, all collective action group members are required by Defendant to work more than 40 hours a week; have substantially the same job requirements and pay provisions described in this complaint; work pursuant to Linked's common business practices and procedures as described herein; and, as a result of such practices, were not paid the legally mandated overtime and wages for all hours worked over 40, as required by the FLSA.

76.    Resolution of this action requires inquiry into many common facts, including Linked's common procedures, compensation, timekeeping, and payroll practices.

77.    Upon information and belief, the collective action group for whose benefit this action includes an unknown number of salon assistants who each worked under the same uniform

Linked policies, practices, and conditions outlined herein in the three years prior to the filing of this Complaint.

78. Ms. Watson is a member of the similarly situated collective action group she seeks to represent, and her claims arise from the same factual and legal basis as those of the other group members.

79. Ms. Watson has no interest antagonistic to, or in conflict with, the collective action group members.

80. All members of the collective action group have been injured by the same company-wide policies and practices by Linked as described herein.

**COUNT I**
**FLSA and PMWA: Failure to Pay Overtime**
**Ms. Watson v. All Defendants**

81. Ms. Watson incorporates the allegations of the preceding paragraphs as if fully restated.

82. During most or all of the workweeks during her employment, Ms. Watson worked more than 40 hours per workweek.

83. Ms. Watson was not exempt from overtime.

84. Ms. Michelle is an "employer" within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 203, and the Pennsylvania Minimum Wage Act, 43 P.S. § 333.103(g), because she exercised significant control over the corporate affairs of Linked, and had authority to make wage payment decisions.

85. Defendants failed to pay Ms. Watson at least 1.5 times her regular rate for all workweeks in which she worked more than 40 hours, in violation of the FLSA, 29 U.S.C. § 207(a), and the PMWA, 43 P.S. § 333.104(c).

86. Defendants failed to pay Ms. Watson overtime without good faith, and without reasonable grounds to believe that they did not act in violation of the FLSA.

87. Therefore, pursuant to 29 U.S.C. §§ 216(b) and 260, Ms. Watson is also entitled to liquidated damages in an additional amount equal to the amount of unpaid overtime wages.

**COUNT II**
**FLSA: Collective Action Failure to Pay Overtime**
**Ms. Watson and Collective Action Plaintiffs v. All Defendants**

88. Ms. Watson incorporates the allegations of the preceding paragraphs as if fully restated.

89. Linked employed Ms. Watson and Collective Action Plaintiffs in commerce for many work weeks more than forty hours but failed to compensate them for such work in excess of forty hours at a rate not less than one and one-half times the regular rate at which they were employed, in violation of FLSA, 29 U.S.C § 207(a).

90. During the same period, Defendants further failed to pay Ms. Watson and Collective Action Plaintiffs overtime payments beyond the next payday after the overtime was worked and computed, in violation of 29 U.S.C. § 207(a), and 29 C.F.R. § 778.106.

91. Defendants failed to pay Ms. Watson and Collective Action Plaintiffs overtime without good faith, and without reasonable grounds to believe that they did not act in violation of the FLSA.

92. Therefore, pursuant to 29 U.S.C. §§ 216(b) and 260, Ms. Watson and Collective Action Plaintiffs are also entitled to liquidated damages in an additional amount equal to the amount of unpaid overtime wages.

93. Defendants' refusal to pay Ms. Watson and Collective Action Plaintiffs at a rate not less than one and one-half the regular rate at which they were employed for work performed

in excess of the forty-hour workweek was willful.

## COUNT III
### FLSA: Retaliation
### Ms. Watson v. All Defendants

94.     Ms. Watson incorporates the allegations of the preceding paragraphs as if fully restated.

95.     In submitting complaints to Defendants regarding failure to be paid for additional work beyond 40 hours, Ms. Watson engaged in protected activity under the Fair Labor Standards Act ("FLSA").

96.     Specifically, Ms. Watson had a good faith belief that Defendants' failure to pay for overtime violated their obligations under the FLSA.

97.     Defendants fired Ms. Watson in retaliation for her FLSA-protected complaints, in violation of 29 U.S.C. § 215(a)(3).

98.     Defendant acted with malice or reckless indifference to Ms. Watson's federally-protected rights in firing her in retaliation for her FLSA-protected complaints.

99.     As a direct and proximate cause of Defendant's termination of Ms. Watson, she has suffered damages, including but not limited to lost wages and benefits, emotional distress, and like injuries.

## COUNT IV
### Wage Payment and Collection Law
### Ms. Watson v. All Defendants

100.    Ms. Watson incorporates the allegations of the preceding paragraphs as if fully restated.

101.    Defendants agreed to pay Ms. Watson a salary that constituted "wages" within the meaning of 43 P.S. § 260.2a.

102.    Defendants failed to pay Ms. Watson for hours worked on December 30 within 30

days of the regular pay day.

103. There is no good faith dispute justifying Defendants' non-payment of Ms. Watson's wages.

## COUNT V
### Fraudulent Information Return
### Ms. Watson v. All Defendants

104. Ms. Watson incorporates the allegations of the preceding Paragraphs as if fully restated.

105. For the year 2024, Linked filed with the IRS 1099-NEC forms related to payments issued to Ms. Watson.

106. Ms. Michelle directed and/or participated in Linked's filing of the above 1099-NEC form.

107. The 1099-NEC forms that Defendants filed related to Ms. Watson constitute "information returns" within the meaning of 26 U.S.C. §§ 7434 and 6724(d)(1)(A).

108. Defendants knew that Ms. Watson was an employee rather than an independent contractor at the time that the 1099-NEC forms were filed, but filed those forms to avoid paying payroll taxes and other obligations that come with acting as an employer.

109. By filing and issuing 1099-NEC forms related to Ms. Watson when they knew she was an employee rather than an independent contractor, Defendants willfully filed fraudulent information returns with respect to payments purported to be paid to Ms. Watson, in violation of 26 U.S.C. § 7434.

110. Ms. Watson has suffered actual damages as a result of Defendants' filing of false information returns, including but not limited to the anticipated payment of double social security and Medicare taxes and attorneys' fees and costs.

## COUNT VI
### Breach of Contract
### Ms. Watson v. Linked Hair Salon, LLC

111.    Ms. Watson incorporates the allegations of the preceding Paragraphs as if fully restated.

112.    The SIT Program constituted an oral contract between the parties.

113.    Every contract imposes on each party a duty of good faith and fair dealing in its performance and enforcement.

114.    Linked violated such duty and acted in bad faith when it failed to act consistently with the parties' reasonable expectations by engaging potential clients for Ms. Watson and interfering with clients that had booked with Ms. Watson by rescheduling them with Ms. Michelle.

115.    But for Linked's lack of good faith, Ms. Watson would have earned a minimum of $6,750 in commission payments.

116.    Ms. Watson has suffered actual damages as a result of Linked's actions, including but not limited to the loss of commission for the weeks it failed to comply with the SIT Program requirements and loss of commission for the rescheduled client(s).

117.    Moreover, on or about September 26, 2024, the parties formed an oral contract whereby Ms. Watson would be paid an annual salary of $71,500 for performing the duties of a Salon Assistant.

118.    The payments due under the above oral contract were not conditioned on Ms. Watson signing any sort of agreement or document at the end of her employment.

119.    Ms. Watson performed the duties of a Salon Assistant on December 30, 2024.

120.    By failing to pay Ms. Watson on December 30, 2024, Linked materially breached the above oral contract.

121.    As a direct and proximate result of Linked's breach of contract, Ms. Watson has suffered damages.

## COUNT VII
### Tortious Interference with Contractual Relations
### Ms. Watson v. Ms. Michelle

122.    Ms. Watson incorporates the allegations of the preceding Paragraphs as if fully restated.

123.    As set forth above, Ms. Watson and Linked formed a contractual relationship with respect to the SIT program, whereby Linked would advertise for Ms. Watson's services and would pay her a commission for those services.

124.    Ms. Michelle intentionally and without justification interfered with the above contractual relationship by failing to advertise Ms. Watson's services as promised, and by diverting services to herself that were to be assigned to Ms. Watson.

125.    Ms. Michelle undertook the above activities with the intention to cause financial harm to Ms. Watson.

126.    As a direct and proximate result of the above actions, Ms. Watson has suffered damages in the form of lost commissions.

WHEREFORE, Plaintiff demands judgment against Defendants, and the following relief:

    a. Damages for unpaid overtime to Ms. Watson and Collective Action Plaintiffs under Counts I and II;

    b. Liquidated damages equal to 100% of the total unpaid overtime wages to Ms. Watson and Collective Action Plaintiffs under Counts I and II;

    c. Damages for unpaid wages to Ms. Watson under Count III;

    d. Compensatory damages for non-economic injuries under Counts III and VII;

    e. Punitive damages under Counts III and VII;

    f. Damages for unpaid wages to Ms. Watson under Counts IV and VI;

g.  Liquidated damages equal to 25% of the total unpaid wages, or $500, whichever is greater to Ms. Watson under Count IV;

h.  Actual damages, including the wrongful payment of social security and Medicare taxes, or $5,000, whichever is greater, to Ms. Watson under Count V;

i.  Actual damages of approximately $6,750 for lost commission wages Ms. Watson was entitled to under the SIT program under Counts VI and VII;

j.  Prejudgment interest and post-judgment interest under all Counts;

k.  A gross-up to account for any negative tax consequences arising of out of the judgment under all Counts;

l.  Attorneys' fees associated with this action under Counts I-V;

m.  Costs under all Counts; and

n.  Any other relief that the Court deems just and proper.

Respectfully submitted,

**ELZER LAW FIRM, LLC**

/s/ Tamra K. Van Hausen
Tamra Van Hausen
Pa. I.D. No. 330577
Christine T. Elzer
Pa. I.D. No. 208157

960 Penn Avenue
Suite 1001
Pittsburgh, PA 15222
(412) 230-8436
tvanhausen@elzerlaw.com
celzer@elzerlaw.com

Attorneys for Plaintiff